**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NURDAN DAWN AVDYLI,** | ) | |
| **Plaintiff,** | ) | **Judge Blanche M. Manning** |
| | ) | |
| **v.** | ) | **Case No. 05 C 2132** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Nurdan Dawn Avdyli brings suit against Jo Anne Barnhart, the Commissioner of the Social Security Administration ("SSA"), for employment discrimination. Avdyli alleges that she was subjected to a hostile work environment because of her race, gender, and religion. The SSA moves for summary judgment. For the reasons provided below, the motion is granted.

**I.     Facts**

*A.     Avdyli's Position at SSA*

Avdyli, a Muslim white woman, is employed by the SSA as a teleservice agent. She has held this job since 1996. A teleservice agent takes calls that come into the teleservice unit through the SSA's national 800 number. There are approximately 200 teleservice agents. At the time that Avdyli started, the area where the agents sat was completely open, but in approximately 1998, partitions were put in and the agents now sit in cubicles. Each of the teleservice agents reports to one of nine first-line supervisors, and the first-line supervisors report to a manager.

*B.     Sexual Harassment Allegations*

During her deposition, Avdyli testified that she was being sexually harassed at work by

four people: Joseph Augustin, Peter Osborn, James Rivera, and Carlos Cisneros.

1. *Augustin*[1]

Augustin was not Avdyli's immediate supervisor, but was one of the nine supervisors in the teleservice center. Although Augustin was not Avdyli's direct supervisor, he had the power to approve or deny leave when employees called in for a shift, and assisted with problem calls referred by teleservice agents. Avdyli admits that she did not report Augustin's alleged harassment to her supervisor, Yuella Sharp. However, Avdyli states that she told a manager in Human Resources, whom Avdyli saw at the gym, that her workouts must be successful because "even . . . managers here are hitting on me."

According to Avdyli, Augustin sexually harassed her over a two-month period during the summer of 2003. The alleged harassment during that two-month period in 2003 consisted of Augustin: telling Avdyli that she had pretty hair and eyes, and that she looked "hot" in her pink workout clothes and was "gorgeous"–comments that offended Avdyli; telephoning Avdyli one Sunday and suggesting they get together; asking Avdyli if she planned to attend a concert given by a co-worker; giving Avdyli a copy of a promotion application (Form 45) to use as an example for amending her own application (which Avdyli interpreted as an "exchange" to get her to go out with him); and once touching her knee while sitting next to her at a table in a small cubicle.

Avdyli also testified that she felt uncomfortable every time Augustin passed her desk or looked at her and that he openly stared at her body, specifically her breasts. Shortly after Augustin began commenting on her looks, he called her on her cell phone and asked her on a

---

[1]For reasons unknown to the court, Avdyli fails to include Augustin's allegedly harassing behavior in the statement of facts section of her response brief.

date, which invitation Avdyli declined. After Avdyli turned down Augustin's requests for a date, he passed by her desk, stared at her, and gave her "dirty looks."

Avdyli did not report Augustin's behavior to the EEO office because she previously had "reported Peter Osborn calling [her] house and making harassing calls . . . [a]nd if [she] brought in another person and reported another person to management, they would think . . . 'My God, what does she think she is, some kind of Miss America or something?'."

2.  *Osborn*

The court notes at the outset that the record is not at all clear as to the specifics regarding Avdyli's complaints (i.e., when, where, about whom) and the SSA's response to these complaints. For example, the parties agree that Avdyli's seat was changed on several occasions as a result of her complaints of alleged harassment by Osborn, among others. However, the parties rarely, if ever, use specific dates so determining whether seat assignment changes described by the SSA are the same as those discussed by Avdyli is virtually impossible. The court has tried to the best of its abilities to create an accurate summary of Avdyli's complaints and the SSA's response to these complaints from the parties' combined statements of fact and the underlying record.

This observation leads to the second problem encountered by the court in addressing the claims against Osborn–foundation for the alleged harassment. Based on the parties' statements of fact, it appears that the following several different acts or types of conduct comprise the sexual harassment claim against Osborn:

1) an obscene phone call allegedly made by Osborn to Avdyli's home;
2) an inquiry by Osborn at some point in 1996 or 1997 as to whether Avdyli had a boyfriend and a request for a date;
3) on one occasion after September 11, 2001, Osborn placing a towel on his head and laughing with his coworkers, which Avdyli believed to be directed at her;

4) numerous instances of Osborn walking by Avdyli's workstation unnecessarily which sometimes included glaring at her and recruiting others to walk by her desk and stomp their feet; and

5) Avdyli hearing Osborn say to others in the office that "she's a tease" and "she doesn't like blacks."

To defeat a motion for summary judgment, the nonmoving party must produce "evidence of evidentiary quality." *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). Evidence satisfies this standard if it would be admissible at trial. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For example, a proper foundation for a conversation must include information as to when and where the conversation occurred, who was present, and who said what to whom. *See, e.g., Houk v. Village of Oak Lawn*, No. 86 C 139, 1987 WL 7498 *2 (N.D.Ill. Feb.26, 1987)(*citing* Mauet, Fundamentals of Trial Techniques 123 (1980)). Because the court has concerns about the foundation set forth for the various pieces of evidence relating to Osborn's purported sexual harassment, it will address the foundational basis for the facts related to each of the above allegations as it describes them in more detail.

**Obscene phone call**. Avdyli claims that she received an obscene phone call at home from a person who identified himself as "Peter from work" sometime between 1996 and 1999. Avdyli did not recognize her caller's voice as being Peter Osborn. However, Avdyli believes that the caller was Peter Osborn because the caller said "[t]his is Peter from work" and she only knows one Peter at work. According to Avdyli, the caller said "I want to f–k you. I want to f–k you in the ass." Avdyli does not know how he got her phone number but believes he may have gotten it from work. Osborn, as already noted, was not one of the supervisors; he, like Avdyli, was a teleservice agent.

The day after she received the phone call, Avdyli reported it to one of the supervisors,

Jackie Tackett, who told Avdyli that she would report the incident to one of the managers.[2]  The manager called Osborn into the manager's officer and asked him whether he had made the phone call.  Osborn said he had not.

As to the obscene phone call, Avdyli provides specifics as to what was said, where she was when she received the phone call, and whom she believes was the caller.  However, as with much of the other evidence in the record, the evidence as to when this obscene phone call occurred is quite vague.  Avdyli states in her additional statement of fact that the call occurred in 1996 or 1997 (Additional SOF at ¶¶ 4, 35), but during her deposition, when asked when the phone call occurred, she said "I don't recall. Its documented."  Later in her deposition, Avdyli states that she does not know when the call occurred but that she told Richard Farbach, a supervisor, about the call in 1998 or 1999 "right before he retired."  Avdyli Dep. at 40.  To add to the confusion, Avdyli admits the statement of fact by the SSA that she received the phone call in 1998 or 1999.  Ultimately, the court has no basis upon which it can definitively identify even the year in which the call occurred.  All the court can state based on the evidence is that the alleged call occurred sometime between 1996 and 1999.

However, because Avdyli has provided specifics as to what was said and where she was when she received the call and the fact that she states that she received it on a Sunday, and Osborn testified that he was called into a supervisor or manager's office about the phone call "at least about five or six years ago" from the date of his deposition, March 2006 (which call he denied making), the court finds the foundation sufficient to consider the alleged phone call on summary

---

[2]Although not so stated in her deposition, in a supplemental affidavit, Avdyli states that she also told a woman named Carrie Benjamin about the phone call, but fails to identify who Carrie Benjamin is.

judgment.

In her affidavit, Avdyli attests that only one to two days after receiving the phone call, she reported the phone call to her manager, Richard Farbach, and that his response was to tell her she was not being sexually harassed and "not to worry about it."[3]

According to Avdyli's affidavit, after she complained about the call, her seat was moved away from Osborn, but less than a month later, Osborn was moved about three seats from Avdyli and despite Avdyli's complaints, the SSA kept her seated in the same seat near Osborn until 2003. The SSA denies these assertions saying no evidence supports them and no evidence shows that Avdyli complained to management about Osborn's alleged harassment before 2003. In support, the SSA points to an October 2003 memorandum from Diamond to Avdyli, attached to Avdyli's statement of facts as Exhibit 7, in which Diamond states that Avdyli refused to identify the employees that Avdyli claims were harassing her. The court acknowledges that while one part of the letter indicates that Avdyli failed to name the alleged harassers, in a later section of the letter,

---

[3]The SSA does not deny this statement of fact but instead asserts that "[t]here is no evidence other than Avdyli's own self-serving testimony to support the fact that she told a retired manager that she was being sexually harassed." Apparently, the SSA believes that her deposition testimony, in which she stated that she talked to Farbach about the obscene phone call and that Farbach did not do anything because he retired, contradicts her affidavit. An affidavit can be self-serving provided that it does not contradict earlier deposition testimony and is otherwise admissible testimony. *Rogers v. City of Chicago*, 320 F.3d 748, 751 (7th Cir. 2003). "However, a plaintiff cannot defeat summary judgment by submitting a self-serving affidavit that contains 'the bald assertion of the general truth of a particular matter.'" *Fanslow v. Chicago Mfg. Center, Inc.*, 384 F.3d 469, 483 (7th Cir. 2004)(citation omitted). Rather, the affidavit must "cite specific concrete facts establishing the existence of the truth of the matter asserted." *Id.* (citation omitted). The court does not find the testimony to be contradictory–each states that she told Farbach about the call and that he did nothing. The reason that he supposedly did nothing is not relevant. Moreover, the court finds that Avdyli has cited to concrete facts by stating that she spoke to Farbach one to two days after the call, told him that she was being sexually harassed, he responded that she was not being sexually harassed and "not to worry about it." Accordingly, the court finds sufficient foundation to admit this affidavit testimony.

Diamond states that "[e]ven though you have not specifically named the individuals in your October 7, 2003, statement, *I am assuming that the persons we had previously discussed are the individuals who had allegedly harassed you*." (emphasis added). Diamond then states that she would hold fact-finding interviews with the two individuals and take appropriate action if necessary. Thus, the record evidence supports the contention that Avdyli reported harassment earlier than 2003. Ultimately, given this evidence plus the fact that the SSA admits that Avdyli's seat was moved on at least three occasions, without providing additional details regarding the exact dates of these moves, the court cannot conclude that Avdyli's affidavit testimony on this topic is unsupported.

**Request by Osborn for a date**. Avdyli asserts that Osborn tagged along with her to lunch one day in "probably '96 [or] '97", asked her if she had a boyfriend and if she would date him. According to Avdyli, she told Osborn that she had a boyfriend and denied his request for a date, and they walked back to the office with their lunches. During his deposition, Osborn admitted going to get lunch with Avdyli on a few occasions but denied ever asking her out. The SSA admitted this statement of fact by Avdyli for purposes of the motion. The court finds that Avdyli has provided sufficient foundation such that the court may consider it for purposes of this motion.

**Towel-on-head incident.** Avdyli also claims that she was sexually harassed and discriminated against based on her religion when, on some unknown date after September 11, 2001, Avdyli saw Osborn wear a towel on his head for approximately 30 minutes. He was walking up and down the aisle with the towel on his head, and although she did not hear what Osborn was saying, she believes he was making fun of Muslims because approximately four other employees were laughing about it. Avdyli said that she told her supervisor, Yuella Sharp, about

the incident, but that Sharp did nothing. Avdyli then told someone either named Carrie Hughes or Carrie Woods, a woman in between a supervisor and a manager, and 20 minutes later Osborn removed the towel. Osborn was never addressed by management for wearing a towel on his head. The SSA admits this statement of fact for purposes of this motion. Accordingly, the court finds sufficient foundation for this evidence such that it can be considered for purposes of this motion.

**Walking by Avdyli and glaring.** According to Avdyli, Osborn sexually harassed her on a continuous basis by walking along the aisle next to her desk and staring at her. Avdyli complained several times to Jackie Diamond, a manager in the teleservice unit, that Osborn was walking past her desk and looking at her. Osborn testified that he had been called into the manager's office several times over the past five to seven years because of complaints by Avdyli that she was disturbed by the fact that he was walking past her workstation. According to Osborn, in order to do his job he had to walk by some of the spots that Avdyli sat in over the years but not all of the spots.

In an effort to make Avdyli more comfortable, Diamond moved Avdyli to another workstation, so that Avdyli and Osborn would be in different rows–a "couple of cubicles away." Osborn continued to walk around Avdyli's area. One of the managers told Osborn that Avdyli still was disturbed by Osborn's presence, and asked Osborn to try not to walk around her area. Osborn testified that after this warning, he stopped walking by Avdyli's desk. Avdyli, however, denies this and points to an affidavit she filed which states that she "continually complained" to her supervisors that Cisneros, Rivera, and Osborn were intentionally walking past her cubicle for no reason and that she was intimidated. Moreover, Avdyli attests in the affidavit that although she was moved at least three times, Osborn would "always find reasons to walk by [her] cubicle."

Indeed, the SSA admits that "Osborn continued to walk by Plaintiff's work area, even after Plaintiff's seat was removed."

Diamond later moved Avdyli's workstation again so that she was sitting next to the administrative area. When Osborn was promoted in November 2004, he was moved to a different floor in the same building. After he had moved, Osborn appeared on January 28, 2005, at the teleservice center, walked past Avdyli's desk, turned around, walked past a second time, and glared at Avdyli.

Neither Avdyli's deposition nor affidavit sets forth any specifics as to the time period when Osborn was walking by her desk and glaring. She relies instead on nonspecific statements such as "always" and "continually" and "daily." However, given that the SSA admits that: Avdyli complained on numerous occasions regarding the alleged harassment, and that despite being called into the manager's officer on several occasions and asked to stop walking by Avdyli's desk, Osborn continued to do so, the court deems admissible Avdyli's contention that Osborn's alleged walking by her desk occurred on a consistent and ongoing basis. *Ferguson v. Chicago Housing Authority*, 155 F. Supp.2d 913, 916-17 (N.D. Ill. 2001)(where Title VII plaintiff alleged that unwanted physical contact involved "ongoing actions" and could not identify exactly how many times the physical contact occurred, but could describe several concrete instances, testimony deemed allowed to be considered by jury where defendant's summary judgment motion on hostile work environment claim denied).

**Statements by Osborn to coworkers**. Avdyli asserts that after she rejected Osborn's request for a date, she heard him state to coworkers in the office that "she's a tease" and "she doesn't like blacks." Because Avdyli provides no indication as to when (only "after the lunch

incident") or how often she heard the statements or to whom the statements were made, the court

finds that the proper foundation as to these statements is lacking and will not consider them for

purposes of this motion.

In summary, in addressing the sexual harassment claim against Osborn, the court will

consider as admissible evidence in support thereof: (1) Osborn's inquiry as to whether she had a

boyfriend and his request for a date; (2) the alleged obscene phone call; (3) the incident where

Osborn put a towel on his head; and (4) Osborn's practice of "always" walking by Avdyli's desk

unnecessarily and glaring at her.

### 3. *Rivera and Cisneros*

Avdyli testified that Rivera would "pop up" wherever she was and generally gave her the

creeps, but he never did or said anything of a sexual nature. Rivera would appear (along with

Cisneros and Osborn) around her work area for no apparent reason, and, according to her EEO

complaint, stomp his feet by her desk. According to Avdyli, Rivera and Cisneros were recruited

by Osborn to do this.

### C. *Allegations of Harassment by Taylor and Henderson*

Avdyli attested in her affidavit that in or around September 2003, a female coworker,

Lorice Taylor, yelled in Avdyli's face at work and gestured with her hands. Avdyli attests that

both Diamond and Cisneros, a manager and supervisor respectively, could hear and see what was

going on, but did nothing. However, in the next sentence of her affidavit, while stating that she

knew Cisneros was there because she saw him, she then states that "she *believes* Jackie

[Diamond] was there also." Avdyli attested that the event caused her so much stress that she

requested an extended medical leave of absence the next day.

In or around February 2004, after Avdyli had returned to work from the medical leave of absence, Kevin Henderson banged loudly on Avdyli's cubicle wall and laughed when she was startled. Avdyli was required to seek medical attention from an SSA nurse that day.

D.    *Race Harassment Allegations*

According to Avdyli, she was discriminated against based on her race (white) because most of the managers and supervisors are black, and none tried to help her.

E.    *Religious Harassment Allegations*

Avdyli believes she was discriminated against on the basis of her religion, which is Muslim. According to Avdyli, when she reported to one of her supervisors (Lovell Washington) that Osborn had been harassing her by stopping by her desk, glaring at her, and standing by the window before going back upstairs, Washington responded by telling Avdyli that she would pray for Avdyli. Avdyli also states that Washington later came to her desk, took a pad of paper out of Avdyli's purse and wrote: 'Lovell's Pastor – God said for Dawn to lay hands on yourself and say 'God I thank you for my mind back!! Say it often to God.'" Avdyli seeks to rely on the note in support of her religious harassment argument and SSA seeks to strike the note on the ground that it is inadmissible hearsay. However, statements of a party-opponent are not hearsay. Accordingly, the SSA's objection is overruled.

Avdyli also believes that the towel incident with Osborn described earlier constituted religious harassment.

F.    *Additional Facts Regarding Avdyli's Reports of Harassment and the SSA's*

Avdyli's seat was moved at least three times in response to her complaints of harassment in the teleservice center. Jackie Diamond acknowledged that Avdyli complained to her about alleged harassment by co-workers at least three or four different times as of October 20, 2003. Sometime after Avdyli's workstation was moved based on her complaints of intimidation and glaring, she asked Diamond to transfer, demote, or move her. Diamond responded that transfer decisions were out of her hands because they were made by upper management and that all Diamond could do was try to make Avdyli comfortable by moving her desk.

After Avdyli complained to Diamond, Diamond did not inform her of the procedures for filing an EEO complaint; rather, she suggested that Avdyli seek counseling from the Employee Assistance Program. In 2003, the SSA again switched Avdyli's seat. The SSA admits this fact as set forth by Avdyli, but, as with so many of the other facts, it is entirely unclear from the record what specifically prompted the seating reassignment and which of the three or four reassignments this one was. She was moved away from Osborn but was only one desk away from Rivera and was only 12 feet away from Osborn. Before Avdyli returned from sick leave in October 2003, Diamond assured Avdyli that she would be moved to a new seating area and Diamond did transfer Avdyli to a spot near the supervisor's area. However, in June 2004, Carlos Cisneros was seated one cubicle away from Avdyli in the same work area and Augustin was later moved to the same area.

---

[4]Because of the disjointed manner in which the parties have presented their statements of fact, the court is not certain how these facts interact with ones earlier presented and indeed suspects that some overlap exists. However, in the interest of including all relevant information, the court includes this section of additional facts.

Avdyli's manager, Willie West, is black. Avdyli believes that West was aware from Richard Farbach that Avdyli was being sexually harassed. Avdyli also testified that West was aware from Avdyli's supervisor that she changed Avdyli's seating on several occasions. Avdyli asserts that she filed a worker's compensation claim on the advice of Diamond because Avdyli had told her that her "mitral valve and . . . chest pains [were] happening because of everything's that's occurring."

On June 16, 2004, Avdyli contacted one of the SSA's counselor's and reported that she was being sexually harassed and discriminated against on the basis of race and religion, and that she was being subjected to a hostile work environment.

## II.      Standard on Motion for Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). However, where "undisputed facts give rise to disputed inferences," summary judgment is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc*., 319 F.3d 973, 989 (7th Cir.

2003) ("the choice between reasonable inferences from facts is a function of the fact-finder").

## III.    Analysis

Prior to beginning its analysis, the court notes that Avdyli twice states in her response brief that because this is a motion for summary judgment, her allegations are accepted as true. As Avdyli is hopefully aware, this is entirely incorrect. Contrary to the deferential view of the plaintiff's allegations that the court takes on a motion to dismiss, a motion for summary judgment by the defendant requires the plaintiff to "put her money where her mouth is," so to speak. As noted above, in the face of supported facts by the moving party, "the non-moving party must present *definite, competent evidence to rebut the movant's asserted facts*." *Butts,* 387 F.3d at 924 (emphasis added). While the court views all facts and makes all inferences in favor of the non-moving party, none of the disputed allegations are automatically accepted as true. With this clarification in mind, the court proceeds to its analysis.

### A.    Timeliness of claims

The SSA first argues that Avdyli failed to exhaust her administrative remedies for any claims prior to April 28, 2004. Specifically, the SSA states that a federal employee who believes she has been discriminated against must consult an Equal Employment Opportunity counselor at the agency at which the employee works "prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). Moreover, this contact must occur within 45 days of the discriminatory action or matter. 29 C.F.R. § 1614.105(b). According to the SSA, Avdyli did not contact the SSA's EEO office until June 16, 2004. Because the 45th day prior to June 16, 2004, was April 28, 2004, the SSA contends that any events arising prior to April 28, 2004, cannot be considered in her claim of discrimination.

In response, Avdyli asserts that the reporting requirements of 29 C.F.R. § 1613.105(a) do not bar consideration of incidents that contribute to the alleged hostile work environment but fall outside of the statutory time period. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). As stated by the Seventh Circuit,

> In contrast to discrete acts of discrimination, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117, 122 S.Ct. 2061; *see also Hildebrandt v. Illinois Dept. of Nat. Res.*, 347 F.3d 1014, 1027 (7th Cir. 2003). The Court reasoned that the "incidents constituting a hostile work environment are part of one unlawful employment practice." *Morgan*, 536 U.S. at 118, 122 S.Ct. 2061.

*Lucas v. Chicago Transit Authority*, 367 F.3d 714, 724 (7th Cir. 2004). Therefore, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Morgan*, 536 U.S. at 120.[5]

"A plaintiff may establish a continuing violation if separate acts of discrimination are part of an ongoing pattern and at least one of the acts occurred within the relevant limitations period." *Lillie M. Willis v. City of Chicago*, No. 04 C 1502, , 2005 WL 1838342 , at *4 (N.D. Ill. Aug. 1, 2005)(citations omitted). In *Morgan*, the Supreme Court cited the following factors relied upon by the Ninth Circuit Court of Appeals in determining whether the incidents constituted the same hostile work environment claim: (1) the incidents involved the same type of employment action, (2) the incidents occurred relatively frequently; and (3) the incidents were perpetrated by the same

---

[5]While *Morgan* addresses a different statutory time period for filing charges, 42 U.S.C. § 2000e-5(e), than the one at issue here, the court will assume for purposes of this motion that the continuing violation line of cases also applies to the instant situation.

managers. *Morgan*, 536 U.S. at 120 (citation omitted). The Supreme Court found that Morgan's evidence that "managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets," were all part of the same hostile work environment claim even though many of the acts occurred outside the 300-day filing period. *Id.*

1.      *Augustin*

Here, Avdyli appears to contend that Augustin's acts and certain of Osborn's conduct, although outside the 45-day reporting period, were all part of the same hostile work environment claim.[6] As to Augustin's acts, the court finds that they do not form part of the same hostile work environment claim as Osborn's actions. Avdyli claims that Osborn began harassing her in 1996 when she started in the teleservice center and continued to the time of her complaint. According to Avdyli, Osborn recruited Rivera and Cisneros to assist in his harassment of her. Alternatively, Avdyli asserts that Augustin's harassment was confined to an approximately two-month period in the summer of 2003. While the alleged conduct by Augustin which Avdyli found objectionable occurred within a relatively short period of time and appears to have ended when Augustin realized that Avdyli was not interested in dating him, Osborn's alleged conduct was ongoing over many years and, indeed, he purportedly enlisted the help of others in his harassment of Avdyli.

The court concludes that while Augustin's and Osborn's alleged acts of harassment were somewhat similar in type (in that they appear to have been made as some kind of misguided

_____

[6]Although Avdyli appears to group the alleged harassment by all of the individuals into one hostile work environment claim, the court has purposely not included the actions of Taylor, Henderson, Rivera, and Cisneros in this part of the analysis because the court concludes later in the order that Avdyli has failed to demonstrate that their alleged harassment was based on Avdyli's membership in a protected class.

romantic overture–or at least started out that way), they were committed by a different perpetrator and, although the time periods overlapped, Osborn's conduct was ongoing while Augustin's took place over a discrete period of time. As such, the court finds that the conduct by Augustin and Osborn are not part of the same hostile work environment claim.

Avdyli also contends, however, that she was not told of the 45-day time limit and therefore could not have made a timely claim. 29 C.F.R. § 1614.105(a)(2)("The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them. . . . "). According to Avdyli, she complained to her supervisor, Jackie Diamond, on several occasions and was never told of the proper procedure for filing an EEO claim. This claim, however, is belied, at least as to Augustin, by Avdyli's testimony that she never reported Augustin's behavior because she had already reported Osborn's and did not want to be perceived as a "Miss America."

In any event, the SSA responds that (1) Avdyli was given an EEO pamphlet when she started work in 1991; (2) a sexual harassment poster hangs in the main lobby of the building; (3) there is an EEO office six floors above the floor where she works; (4) Avdyli certified that she received sexual harassment training in 2001; and (5) Avdyli and all other employees received the agency's written policy prohibiting discrimination, which includes numerous citations to websites and applicable regulations. However, the SSA does not point to any provision in any of these documents/training materials/posters that specifically details the 45-day time limit. Indeed, the SSA fails to direct the court to any specific sentence or provision of the exhibits cited, the court is not required to sift through the evidence to find facts in support of the SSA's claim, and the court's review of the documents did not reveal that such information was provided to Avdyli.

Given the SSA's failure to point to any specific competent evidence that it informed Avdyli of the 45-day time limit to report her claims to the EEO officer at the SSA, it has failed to meet its burden of establishing the lack of any genuine issue of material fact on the notification issue. As such, the court finds that the 45-day period should be extended. Nevertheless, as discussed below, the alleged conduct by Augustin toward Avdyli is not severe or pervasive enough to establish a hostile work environment and accordingly, her sexual harassment claim as it relates to Augustin fails.

2.      *Cisneros and Rivera*

However, as to Osborn, Rivera's and Cisneros' conduct which occurred outside of the 45-day period, the court finds that, based on the considerations outlined above, these acts are part of the same hostile work environment claim. They were allegedly performed by Osborn (or at his direction), they were the same types of actions--walking by the desk for no reason, staring, stomping feet, making teasing comments,--and, with the exception of the obscene phone call, they were performed frequently.

B.      Hostile Work Environment

In order for Avdyli to survive summary judgment on a claim of hostile work environment, she must establish that: (1) she was subjected to unwelcome harassment, (2) the harassment was based on her race/gender/religion, (3) the harassment was severe and pervasive enough to alter the conditions of her environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005)(*citing Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004)).

1.      *Race Harassment*

As to Avdyli's claims of racial harassment, she has set forth no evidence demonstrating that the alleged harassment was in any way related to the fact that she was white. Because she has failed to set forth the required connection between the alleged harassment and her race, the SSA's motion for summary judgment on Avdyli's racial harassment claim is granted. *Beamon*, 411 F.3d at 863-64 ("[W]e have held that the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.").

### 2. Religious Harassment

As to her claim of religious harassment, Avdyli points to (1) the statement by her supervisor, Washington, that she would pray for Avdyli and Washington's note written soon thereafter that God said for Avdyli to lay hands on herself; and (2) Osborn's post-September 11, 2001, towel-on-the-head incident.

In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)*,* the United States Supreme Court held that "[f]or ... harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." The Court further explained in *Morgan*, 536 U.S. at 116-17, that "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." A discriminatory abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993).

The Supreme Court, however, has also expressed the desire to limit Title VII's applicability to conduct which is actually hostile and discriminatory: "the plaintiff must always prove that the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of [membership in the protected class]." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998)(emphasis in original). In determining whether conduct is severe and pervasive enough to alter the conditions of employment and create a hostile work environment, courts consider both the actual effect of the conduct on the plaintiff (the subjective test) and what the effect would be on a reasonable person in the plaintiff's position (the objective test). *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993). Whether conduct is objectively hostile or abusive must be determined "by looking [at the conduct under] all the circumstances ." *Harris*, 510 U.S. at 23.

Factors that are relevant in determining whether a reasonable person would find conduct hostile are the frequency of the conduct, its severity, whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it interferes with the employee's work performance. *Id.* Isolated and/or off-hand remarks or incidents are insufficient to establish a hostile work environment; however, repeated instances of such conduct, however, may be aggregated to support a hostile environment claim. *See, e.g., Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) ("[t]here is no magic number of incidents required to establish a hostile environment").

Here, the court will assume for purposes of this motion that Avdyli timely reported the incident in which Osborn put a towel on his head. Nevertheless, that incident, combined with the statement by Avdyli's supervisor that she would pray for Avdyli and the subsequent note stating

that "Lovell's Pastor – God said for Dawn to lay hands on yourself and say 'God I thank you for my mind back!! Say it often to God,'" are insufficient for Avdyli to survive summary judgment on her religious harassment. These were isolated events that were not physically threatening and were not so severe that they would alter the conditions of Avdyli's employment. *Filipovic v. K & K Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (four national origin-related comments made over the course of more than a year not sufficient to create a hostile environment); *Rabinovitz v. Pena*, 89 F.3d 483, 489 (7th Cir.1996) ("an employee may not be unreasonably sensitive to his working environment"); *Saxton*, 10 F.3d at 535 ("inaccessibility, condescension, impatience, and teasing" were " 'merely offensive'"); *North v. Madison Area Assn. for Retarded Citizens--Dev. Centers Corp.*, 844 F.2d 401, 409 (7th Cir. 1988) (sporadic use of racial epithets and slurs were insufficient to support a Title VII claim). *See also Kaplan v. City of Chicago*, 99 C 1758, 2004 WL 2496462, at *13-14 (N.D. Ill. Nov. 4, 2004)(Jewish plaintiff failed to establish hostile work environment where supervisors compared her to "herpes," called her a "slickster," and told her she was "beggaring time off;" a fellow officer told her he "worked like a Jewish slave" and other officers sang "Christian hymns"; supervisors told other officers that plaintiff was getting Friday night and Saturday off because of her religion; a supervisor denied plaintiff's request for overtime and made "derisive" comments about the plaintiff's religion; and supervisor failed to reschedule a make-up test to accommodate religious beliefs). The SSA's motion for summary judgment on the religious harassment claim is granted.

   3. *Sex Harassment*

   Prior to addressing the particular set of circumstances at issue in this case, the court addresses one point relevant to this case regarding the prima facie case of sexual harassment under

Title VII as recently articulated by the Seventh Circuit.  In two of its most recent opinions, the Seventh Circuit sets forth the plaintiff's prima facie case in a hostile work environment context as follows:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability.

*Valentine v. City of Chicago*, 452 F.3d 670, 677 (7th Cir. 2006).  *See also Phelan v. Cook County*, 463 F.3d 773, 783 (7th Cir. 2006).

While *Valentine* and *Phelan* (as well as others) state that the first prong in the prima facie case requires that the harassment have some type of sexual component to it, other Seventh Circuit caselaw undercuts the assertion that the harassment must be of a sexual nature.  *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999)("It makes no difference that the assaults and the epithets sounded more like expressions of sex-based animus rather than misdirected sexual desire although power plays may lie just below the surface of much of the latter behavior as well.  Either is actionable under Title VII as long as there is evidence suggesting that the objectionable workplace behavior is based on the sex of the target.")(*citing Oncale v. Sundowner*, 523 U.S. at 80).  Other authority supports this conclusion.  *See, e.g.*, C. Geoffrey Weirich, *Employment Discrimination Law,* Ch. 20 at 593 (3d ed. 2002 Cumulative Supplement)("Although harassment must be because of gender, it need not be sexual in nature to be actionable."); Alba Conte, *Sexual Harassment in the Workplace*, § 3.05[B] at 192 (3d. ed. 2000)("Offensive verbal or physical conduct need not be overtly sexual to be deemed sexual harassment.").  *See also Curde v. Xytel Corp.*, 912 F. Supp. 335, 340 (N.D. Ill. 1995)("We believe the most recent statements by the Seventh Circuit dispel

the notion that hostile work environment claims are limited solely to situations of a sexual nature; rather, actionable harassment 'encompasses *all forms of conduct* that unreasonably interfere with an individual's work performance or create [] an intimidating, hostile, or offensive work environment.'")(*citing Doe v. R.R. Donnelley & Sons*, 42 F.3d 439, 443 (7th Cir. 1994)(*citing Meritor*, 477 U.S. at 64)(emphasis added in *Curde*)).

Based on the above, the court determines that the alleged sex harassment need not be of a sexual nature but only must be based on animus attributable to the plaintiff's gender.

### A.    Henderson and Taylor[7]

As described above, Avdyli argues that she was subjected to a hostile work environment based on the conduct of the above-named individuals.  This conduct includes Henderson banging on Avdyli's cubicle and startling her when she had returned from medical leave due to a stress-induced illness; and Taylor yelling at Avdyli inches from her face and making gestures with her arms, with the supervisor, Carlos Cisneros, watching and doing nothing.

It is not clear whether Avdyli contends that Henderson and Taylor's alleged discriminatory conduct was based on Avdyli's sex, but nevertheless, Avdyli wholly fails to connect their behavior with any type of discriminatory animus based on Avdyli's inclusion in a protected class, gender or otherwise.  Accordingly, Avdyli's claims of hostile work environment based on the conduct by these individuals fails. *Oncale,* 523 U.S. at 81 ("the plaintiff must always prove that

---

[7]Avdyli fails to identify the basis of the alleged harassment by these individuals (i.e., race, gender, or religion), which ultimately dooms her claim.  Nevertheless, the court analyzes the claim as if it were based on Avdyli's gender, but the analysis would be the same regardless of any protected class that Avdyli might invoke.  The court separates the conduct of these two individuals from the others not because their actions necessarily constituted a distinct hostile work environment claim, but because no evidence has been set forth attributing their alleged conduct to Avdyli's membership in a protected class.

the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of [membership in the protected class].")(emphasis in original).

B.      Augustin

As already discussed at length, Augustin's alleged harassment during that two-month period in 2003 consisted of him: telling Avdyli that she had pretty hair and eyes, she looked "hot" in her pink workout clothes and was "gorgeous,"; telephoning Avdyli one Sunday and suggesting they get together; asking Avdyli if she planned to attend a concert given by a co-worker; giving Avdyli a copy of a promotion application (Form 45) to use as an example for amending her own application (which Avdyli interpreted as an "exchange" to get her to go out with him); and once touching Avdyli's knee while sitting next to her at a table in a small cubicle.

These actions are simply not severe or pervasive enough to rise to the level of a hostile work environment. Giving Avdyli an office form and asking her if she intended to attend the concert of a coworker constitute everyday interactions between coworkers that federal discrimination law does not protect against, no matter how the comments are interpreted by the recipient. Thus, combining the remaining hand-on-the-knee incident with the request for a date and the statements by Augustin that he thought she had pretty hair and eyes, was gorgeous and looked "hot" in her pink workout clothes (which are boorish and unprofessional statements but by themselves do not rise to the level of establishing a hostile work environment), the court concludes that the allegedly harassing conduct taken in its totality is simply not severe or pervasive enough to establish a hostile work environment. *Weiss*, 990 F.2d at 337 (evidence that supervisor asked plaintiff "for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her" held "not [to]

"meet the standard for actionable sexual harassment").  *See also Rogers v. City of Chicago*, 320 F

.3d 748, 750, 752-753 (7th Cir.2003) (several offensive comments and one incident of physical

contact over a period of several months was not an objectively offensive environment).  The

SSA's motion for summary judgment on the sexual harassment claim against Augustin is granted.

C.      Osborn, Rivera and Cisneros

1.      *Rivera and Cisneros*

Regarding the behavior by Rivera and Cisneros, Avdyli claims that they were enlisted by

Osborn to walk by Avdyli's desk and stomp their feet and stare at her.  Therefore, she asserts that

because Osborn's behavior was based on her sex (which the court will assume here for purposes

of this particular argument), his discriminatory animus should be imputed to Rivera and Cisneros.

The court is not convinced that discriminatory animus can be so imputed.  Rather, the Supreme

Court has made clear that the plaintiff must show that the unwelcome behavior occurred because

of her sex.  *Oncale*, 523 U.S. at 81 ("Whatever evidentiary route the plaintiff chooses to follow,

he or she must always prove that the conduct at issue was not merely tinged with offensive sexual

connotations, but actually constituted "*discrimina[tion]* . . . because of . . . sex.")(emphasis in

original).

Avdyli has failed to set forth any evidence that Rivera and Cisneros engaged in their

allegedly harassing behavior because of her sex.  Indeed, the evidence indicates that they did it

because Osborn asked them to do it, not because they were attempting to discriminate against

Avdyli based on her gender.  Because Avdyli has set forth no evidence that Rivera and Cisneros'

behavior was motivated by her sex, the court will not consider the conduct of these two men in

addressing the alleged sexual harassment by Osborn.

2.     *Osborn*

As to Osborn, however, the court concludes that making all inferences in favor of Avdyli (and not accepting her allegations as true, as erroneously argued by her counsel), Osborn's harassment was based on her sex given that the genesis of the harassment seems to have been Avdyli's rebuff of his request for a date.

Regarding whether the harassment was sufficiently severe or pervasive to establish a hostile work environment, the impact of the harassment is assessed both objectively and subjectively. *Hostetler v. Quality Dining, Inc.* 218 F.3d 798, 807 (7th Cir. 2000). Avdyli contends that the constant walking by her desk and glaring occurred regularly and that she felt so threatened and upset by the conduct that she requested several times that her seat be moved and had to take a medical leave of absence as a result of the stress. Based on this evidence, the court finds that Avdyli has met her initial burden of showing that she subjectively considered her work environment to be hostile and intimidating.

The objective inquiry, however, does not so readily lead to an answer. As the Seventh Circuit has noted,

> Drawing the line [between what is hostile and what is not] is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1009-10 (7 Cir.1994). On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. *Meritor Savings Bank v. Vinson, supra*, 477 U.S. at 61, 106 S.Ct. at 2402-03; *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620-21 (6 Cir.1986); *Katz v. Dole*, 709 F.2d 251, 256 (4 Cir.1983). We spoke in Carr of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." 32 F.3d at 1010. It is not a bright line, obviously, this line between a merely unpleasant

working environment on the one hand and a hostile or deeply repugnant one on the other····

*Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430-31 (7th Cir. 1995). "One very severe act of harassment might create a hostile environment, but that would be the rare case. In the typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton v. Keystone*, 455 F.3d 812, 815 (7th Cir. 2006)(citation omitted).

Here, Avdyli complains that Osborn once followed her to where she was buying lunch to ask her on a date (which she rejected), allegedly once placed an obscene phone call to her in which he said "I want to f— you in the ass", placed a towel on his head and laughed at her with coworkers, and then repeatedly walked by her desk when he did not need to (and even after he received a promotion and was moved to another floor) in order to stare and glare at her and generally intimidate her.

Had the intimidating behavior occurred infrequently, the court would not have a problem concluding that the harassment was neither severe nor pervasive. There was no physical contact, and infrequent staring and glaring by an individual who walked by the plaintiff's desk without necessarily needing to is insufficient to create a hostile work environment. This is true even considering the one rejected request for a date and the alleged obscene phone call. However, while the intimidating behavior at issue is not severe, it might be characterized as pervasive. *Cerros v. Steel Technologoes, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)("a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.")

Avdyli fails to state *specifically* how often the incidents by Osborn occurred.[8]

---

[8]Indeed, the court notes that the types of generalized descriptions make it exceedingly difficult for the court to put the evidence in any context in terms of the frequency of the allegedly

Nevertheless, she testified that she complained frequently (indeed, daily) to her supervisor, who agreed that Avdyli's seat assignment was changed on several occasions due to Avdyli's concerns about Osborn. Moreover, Osborn testified that he had been called into the manager's office several times over the past five to seven years because of complaints by Avdyli that she was disturbed by the fact that he was walking past her workstation. Thus, while the alleged conduct was not severe, the evidence indicates that it occurred frequently and was ongoing.

Nevertheless, considering the allegedly offending conduct in its totality, the court cannot conclude that it is pervasive enough to be actionable under Title VII. The actionable workplace is one that is "hellish." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (citation omitted). The court does not doubt that Avdyli believed her workplace to be hellish, but the court finds that, objectively, it was not. Osborn's request for a date, placing a towel on his head, making an obscene phone call, and continually walking by Avdyli's desk unnecessarily while glaring at her were certainly unenlightened and exceedingly unprofessional actions, and the court does not take lightly Avdyli's distress at having to deal with this type of behavior at work.

However, in reference to other cases, in particular those in which physical contact occurred but in which no sexual harassment was found, this court simply cannot conclude that the conduct in this case is the kind that would meet the stringent standards for establishing a hostile work environment under Title VII. *See, e.g., McPherson v. City of Waukegan*, 379 F.3d 430, 434,

---

harassing behavior and the exact dates or general time frame as to which it occurred (i.e. does "always" literally mean every day, once a week, or periodic at an unspecified frequency?). Based on Avdyli's statements, the court assumes that Avdyli is claiming that despite the SSA moving her workstation at least two or three times (the record is conflicting–SSA describes only two moves in its statement of fact but then admits that she was moved at least three times), the harassment continued to the date of at least the filing of her complaint.

439 (7th Cir. 2004) (fact of supervisor pulling back plaintiff's shirt once to see the type of bra she was wearing insufficient); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 459, 463-64 (7th Cir. 2002) (supervisor's rubbing of back and shoulders, which ceased after plaintiff complained); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir.1998) ("four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks"); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 706-08 (7th Cir.1995) (one instance where supervisor rubbed foot against plaintiff's leg and another where he grabbed plaintiff's buttocks); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (assuming, despite contradictory deposition testimony, that two attempts by a supervisor to kiss the plaintiff were insufficient).

Indeed, even if, as Avdyli asserts, Osborn's walking by her desk and glaring occurred on a continual basis, it was never combined with physical touching or other threatening comments or behavior (which the court acknowledges is not a requirement for a hostile work environment claim). However, Avdyli fails to cite any cases similar to the facts of her case in which the court found the conduct sufficiently severe or pervasive to constitute a hostile work environment.

## IV.    Conclusion

For the reasons stated herein, the SSA's motion for summary judgment is granted. The court directs the clerk to enter judgment and terminate the case from this court's docket.

**ENTER:**


DATE:    January 3, 2007

*Blanche M. Manning*

**Blanche M. Manning**
**United States District Judge**